## Pelot v. Walton & Taylor.

(Decided November 2, 1923.)

### Appeal from Bullitt Circuit Court.

1. Brokers—Plaintiffs Held Entitled to One-half Commission Earned. —In an action by brokerage firm against another broker selling land, evidence held to sustain finding of chancellor as to agreement of defendants to pay plaintiffs half of commission earned on sale of land, and a judgment for plaintiffs for such amount.

2. Appeal and Error—Considerable Weight Given Findings of Chancellor.—Where the evidence is conflicting, the reviewing court will give considerable weight to the findings of the chancellor.

GROVER G. SALES and BRUCE, BULLITT & GORDON for appellant.

M. H. THATCHER and CHARLES CARROLL for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Appellant is a real estate dealer in Arcadia, Florida, and appellees are real estate agents at Louisville, Kentucky.

Prior to 1920 there was an agreement between them to the effect that they were to divide equally commissions on sales of Florida property made by appellant to persons who were customers of appellees, and either brought or sent to appellant by them.

In January, 1920, appellees took several persons from Kentucky to Florida who were prospective buyers of citrus fruit groves. During that month they took to Arcadia and introduced to appellant Mr. and Mrs. Duvall from Lebanon Junction, Ky., who were considering the purchase of an orange grove. Accordingly appellant accompanied by one or both of the appellees showed to the Duvalls an orange grove near that city, which resulted in the sale of the same to Mrs. Duvall, and the commission on this sale was equally divided between appellant and appellees.

The property so sold to the Duvalls was known as the Scott grove; originally it had all been owned by one man, but upon his death it descended to his two sons, and they thereafter divided the grove between them, and it was only one-half of it that was sold to the Duvalls, and when they purchased the one-half they probably saw a good part of the other half. It appears that at the time the Duvalls said while they were not ready then to purchase the other half possibly they would do so thereafter, although there is no claim there was any binding obligation upon their part to do so.

In August, 1920, appellant came to Kentucky for the purpose of selling or trying to sell to the Duvalls the other half of the Scott grove which was in his hands for sale, and he notified appellees of his coming and his purpose. He went to see appellees in Louisville and they had some discussion about the commissions they were to receive if the sale was made. It is claimed appellant represented to them he was to receive only a $1,500.00 commission and offered to pay them only $750.00 to aid in the completion of this deal. Appellees, however, distrusting this, wired to the owner, Scott, and received information convincing them that appellant's real commission was $3,000.00.

Appellant went from Louisville to Lebanon Junction and saw the two Duvalls on August 20th, but did not close any deal with them. That day he wired to Walton, who was at a point in Indiana on business:

"If possible get here help me Duvall deal tomorrow."

Accordingly Walton returned to Louisville the next day where he met appellant and Mr. Duvall, and the deal was then closed for the sale of the balance of the Scott grove to the Duvalls for $15,000.00, of which one thousand was represented by a note of Mr. Duvall, which was regarded as a cash payment, and the other $14,000.00 represented by three notes, two for $5,000.00 and one for $4,000.00 payable some time later.

Appellant remained in Louisville for three days thereafter and until the morning of the 24th of August, and during that time there was considerable discussion between the parties as to the commission of appellees. It was appellant's claim, and yet is, that he had agreed to pay them only $1,000.00 in commissions and that as a part of the agreement they were to cash all of the notes representing the whole consideration; that under his contract with his client in Florida he had to pay $4,000.00 in cash before the deal could be put through, and it was necessary for him to have the cash on the notes to do this. Appellees, however, claim they only agreed to get the money on the $1,000.00 note and say they were at all times ready, willing and able to do that, but that they never agreed at any time to see that the other notes were cashed.

On the morning of August 24th, when appellant left Louisville, Walton met him and went to the station with him, and there at the station just about the time his train left he gave to Walton this writing:

"August 24th, 1920, I agree to pay Walton and Taylor $500.00 of $1,000.00 Duvall note when paid, and when deal closed all cash $1,000.00 or more."

Walton testifies that he was dissatisfied with that and complained about the cash provision, and that as the train pulled out appellant told him to scratch out the cash part and that would leave it as he wanted it.

After he left, appellees still being dissatisfied with the situation, Walton went to Lebanon Junction and from there wired appellant at Danville en route to Florida in

substance to return to Louisville on the first train so that they might adjust their differences. To that appellant replied from Somerset, Ky., as follows:

"Impossible return. Will live up to my contract you this morning. Split note and additional $1,000.00; deal closed all cash. Will confirm by letter. This your proposition. What more can I do? Will be at Mason Hotel, Jacksonville, at noon tomorrow. Wire your acceptance."

On the next day appellees wired to appellant at Jacksonville as follows:

"We accept proposition of $1,500.00, but will not guarantee cash deal, but will accept ours in note here and will get enough for your commission and balance of ours if you will send notes to us right away and will get note if we can. Necessary you wire us tomorrow approving this and also the Fourth Street Bank here to turn over the $1,000.00 note to us which we will hold until deal consummated. This done we can do business together."

On August 28th appellant replied to that wire as follows:

"Made you fair proposition on the 24th which you rejected in your wire 25th, and made demands that were out of reason and which I could not possibly accept. If you guarantee handle one-half of amount for cash will protect you $1,000.00. This is final and must be accepted at once."

Negotiations between the parties appear to have stopped shortly thereafter and this suit of appellees for $1,500.00 for their part of the commission resulted.

The evidence of the immediate parties to the transaction in August, 1920, is irreconcilably conflicting as to the terms upon which appellees were to receive the $1,500.00. They never did raise the money on the notes which appellant claims was a material part of the agreement, but the fact remains that there had been previously an agreement between the parties to the effect there would be an equal division of commissions upon sales made to such persons as appellee took or sent to appellant. The salient fact is admitted that appellees first introduced the Duvalls to appellant and that when the latter came to Louisville in August, 1920, he notified ap-

pellees of his coming, and sought their assistance in making the sale to the Duvalls. And while it appears appellees had no prominent part in consummating this deal, it is equally clear appellant by notifying them of his coming to Kentucky and by calling upon them in Louisville, and by wiring to Walton to come back from Indiana to aid in the sale, recognized they had some sort of connection with it.

It is equally clear that whether appellant misrepresented to them the amount of his commission on the deal or not, he actually received $3,000.00 in commissions therefor.

The oral testimony of the witnesses is conflicting, the communications between the parties are more or less confusing, and in fact it is a close case upon the evidence; but in recognition of the rule that in such conditions this court will give considerable weight to the finding of the chancellor we see no tangible thing upon which it might be said that his judgment is against the weight of the evidence.

Judgment affirmed.